# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV - 5 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. **19MJ4907**
cellular telephone assigned telephone number )
(619) 601-1577 with IMEI 357093091468334 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____ District of __New Jersey__, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960, 963, 846, and 841 | Importation of Controlled Substances; Conspiracy to Import Controlled Substances |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Jose Diego, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/5/19

_____
Judge's signature

City and state: San Diego, CA

Honorable Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## *Item to be Searched*

This warrant applies to records and information associated with the cellular telephone assigned telephone number (619) 601-1577 with IMEI 357093091468334 ("the Account"), that are stored at premises controlled by T-Mobile ("the Provider"), headquartered at 4 Sylvan Way, Parsippany, New Jersey 07504.

## ATTACHMENT B

### *Items to be Seized*

The officer executing the warrant shall permit T-Mobile, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**I. Items to be provided by the Provider**

The following information about the customers or subscribers of the Account:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

        ii. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data transactions;

        iii. All available Timing Advance Reports, currently known as True Call, to include cell site, sector, and distance from tower, IP session and Data; and

        iv. All available Mobile Data Session and IPv6 reports.

## II. Information to be Seized by the Government

All information described in Section I that constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 952, 960, 963, 846, and 841 and involving Christopher SULLIVAN during the period of April 23 through August 10, 2018.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Special Agent Jose Diego, having been duly sworn, do hereby state that the following is true and correct to my knowledge and belief.

## INTRODUCTION

1. I make this affidavit in support of an application for information associated with the phone number (619) 601-1577, with International Mobile Equipment Identity ("IMEI") 357093091468334 (the "Account"), including subscriber information, telephone toll data, and cell-site geo-location information for the period of April 23, 2018 up to and including August 10, 2018.

2. I previously obtained a warrant to obtain this data for the date range of August 10 through August 24, 2018. *See* 19-MJ-1365 (S.D. Cal. April 4, 2019). Based on continued investigation, I now seek this data for the date range noted in this application. Except for Paragraphs 22 and 23 of this affidavit, the showing of probable cause for this application is the same as in the prior application. Paragraphs 22 and 23 provide new information to support the request for the date range in this application. Taken together, my two applications seek six months of location data for SULLIVAN, to the date of arrest.

3. As set forth below, probable cause exists to believe that the Account contains evidence of conspiracy to import controlled substances, and importation of controlled substances, in violation of 21 U.S.C. §§ 952, 960, and 963, as well as evidence of conspiracy to distribute and possess with intent to distribute controlled substances, and possession with intent to distribute and distribution, in violation of 21 U.S.C. §§ 846 and 841.

4. The Account is currently in the possession of T-Mobile, headquartered at 4 Sylvan Way, Parsippany, New Jersey 07504. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in

Section II of Attachment B. This Court has jurisdiction to issue this warrant because it is "a district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. §§ 2703(c)(1)(A), 2711(3)(A).

## TRAINING AND EXPERIENCE

5. I am a Special Agent with the United States Department of Homeland Security United States Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I am currently assigned to the Documents and Benefits Fraud Task Force, and was previously assigned to San Ysidro Narcotics Groups III and V. I have been an HSI Special Agent since June 2016.

6. Prior to becoming an HSI Special Agent, I was employed by Enforcement and Removal Operations as an Officer and Agent from December 2012 to June 2016. I was also employed by CBP as an Officer from October 2008 to December 2012, and by the United States Border Patrol as an Agent from December 2007 to August 2008.

7. I am a graduate of the Federal Law Enforcement Training Center Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training course. During these courses, I was trained in various types of criminal investigations, including investigations involving the illegal trafficking of narcotics, currency, firearms and contraband.

8. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

9. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, including methamphetamine, and the investigation of persons in possession of narcotics for purposes of sales and

transportation. In addition, I speak regularly with other narcotics investigators regarding the manner in which sellers of narcotics store, transport and sell narcotics.

10. In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical and electronic surveillance, and executing search and arrest warrants. I have interviewed defendants and witnesses while conducting various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at the San Diego international ports of entry.

11. The following is based on my own investigation, oral and written reports by other law enforcement officers, interviews, subpoenaed and public records, database checks, and other investigations. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested search warrant application. Conversations and discussions below are set forth in substance unless noted.

## FACTS IN SUPPORT OF PROBABLE CAUSE

12. According to a report prepared by CBP Officer I. Harvey, at about 5:20 a.m. on August 24, 2018, Christopher Sullivan ("SULLIVAN") applied for admission to the United States at the Otay Mesa, California, Port of Entry, as the driver and sole visible occupant of a white 2003 Acura MDX, bearing California license plates (the "Vehicle"). The Otay Mesa Port of Entry is located within the Southern District of California.

13. CBP Officer Harvey's report noted that SULLIVAN presented his California driver's license, gave two negative customs declarations, and said he was driving to Murrieta—a city I know to be in southern California. Officer Harvey asked SULLIVAN where his passport was, and SULLIVAN said he had forgotten it. When Officer Harvey asked where SULLIVAN had forgotten the passport, SULLIVAN then said he believed he had lost it. Due to a computer-generated alert, Officer Harvey referred SULLIVAN to secondary inspection.

14. According to the report of CBP Officer C. Weidow, in secondary inspection, Officer Weidow scanned the Vehicle using the "Z-Portal" X-Ray machine. That scan showed anomalies in the passenger-side rear quarter panel of the Vehicle.

15. While the Vehicle was in secondary inspection, and per his report, CBP Officer M. Manders also walked a K-9 Unit around the Vehicle, and the K-9 alerted on the quarter panel.

16. According to the report of CBP Officer M. Kwan, at about 6:30 a.m., Officer Kwan did a physical search of the Vehicle. CBP Officer Kwan drilled a hole into the quarter panel and accessed the area, and was able to extract 18 packages of a substance with a crunchy, crystalline appearance. The substances field-tested positive as methamphetamine. In total, the 18 packages comprised about 21.95 pounds (gross). After field-testing these packages, Officer Kwan placed SULLIVAN under arrest.

17. After being placed under arrest, SULLIVAN received his *Miranda* rights at about 12:13 p.m., and requested an attorney. SULLIVAN's cellular phone was seized during the process of searching the Vehicle and placing SULLIVAN under arrest. (After receiving and invoking his *Miranda* rights, SULLIVAN was transported to a nearby medical facility due to concerns about drug and alcohol consumption.)

18. According to the report of Officer K. Matsunaga, at about 8:30 p.m. that day, Officer Matsunaga looked at the Vehicle again while it was still in the secondary lot, and saw that some of the floor carpeting was disturbed. Officer Matsunaga opened the rear passenger side door and pried back the plastic cover of the armrest box, where Officer Matsunaga found additional wrapped packages. Officer Matsunaga then opened the front passenger door and removed the side panel of the center console area, and found additional wrapped packages. Officer Matsunaga informed the lead CBP Officer, who had a K-9 unit brought to the Vehicle; the K-9 alerted to the Vehicle.

19. At this point, per the reports of Officer Matsunaga and Officer C. Mansouri, Officer Mansouri extracted and seized the additional packages in the area of the center console. At about 8:45 p.m., Officer Mansouri reviewed the area and found 22 packages;

samples of these packages also field-tested positive as methamphetamine. These 22 packages comprised about 26.80 pounds (gross).

20. I have reviewed the contents of SULLIVAN's phone under a search warrant issued by this Court. *See* 19-MJ-101 MSB. Among other items, the phone contains pictures and videos of SULLIVAN, and text-based communications, tending to demonstrate that he used it up until the day of his arrest. Further, from my review I have confirmed that the phone number for this phone is (619) 601-1577. The Account information being sought by this application is for the phone seized from SULLIVAN.

21. I have reviewed information about SULLIVAN's border-crossing activity with the Acura MDX when it bore the license plate that it had at the time of arrest. The information indicates that SULLIVAN crossed the border between the United States and Mexico, at a Port of Entry, on August 10, 13, 14, 15, 16, 17, 22, and 24. On each of these occasions, he crossed the border between 5:00 a.m. and 6:00 a.m., Pacific Time. I am also aware from this review that the Vehicle crossed the border at the San Ysidro and Otay Mesa Ports of Entry on the same dates and at the same times. The records also show that on August 15, the Vehicle left the United States and entered Mexico at the Otay Mesa Port of Entry at 3:13 p.m.; and that on August 16, it left the United States and entered Mexico at 8:16 p.m. I am aware that in general, the DHS records system documents when people enter the United States from Mexico, and that departures at the Otay Mesa Port of Entry were also recorded during August 2018. I infer from these records that SULLIVAN entered the United State from Mexico, driving the Vehicle, on the mornings of the above-noted dates, and that he both entered the United States and returned to Mexico on August 15 and 16.

22. From my review of the data that I have obtained for the Account, I have seen evidence that SULLIVAN drove the Acura MDX over the border, to areas north of San Diego for brief periods of time, and then back south. Specifically, it appears that SULLIVAN made such trips on August 9, 10, 13, 14, and 15. From my training and experience, I believe that this pattern of activity is consistent with courier activity, in that

5

it suggests SULLIVAN drove his car north for the purpose of making a delivery and then returned to Mexico.

23. I have also reviewed additional border-crossing activity of SULLIVAN that suggests additional relevant border-crossing activity. Specifically, I have seen evidence that SULLIVAN crossed the border frequently between April 2018 and August 2018.[1] Moreover, it appears to me that SULLIVAN crossed the border using the Acura MDX both when it had the license plate registered to him (*i.e.*, the plate on the car when he was arrested) and a license plate attributable to the prior owner. Prior to crossing the border with the Acura MDX on these two plates,

24. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them. When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

25. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

    a. Drug smugglers use cellular telephones because the devices are mobile

---

[1] During the date range requested, SULLIVAN had several gaps of a one to two weeks in which he did not cross the border. Specifically, it appears he did not enter between May 11 and May 25; between May 25 and June 20; and between June 30 and July 12. Apart from these ranges, he entered nearly on a daily basis.

6

and provide instant access to telephone calls, texts, internet, application-based communications platforms (*e.g.*, WhatsApp), and voice messages;

b. Drug smugglers use cellular telephones because they are able to actively monitor the progress of the illegal cargo while the conveyance is in transit;

c. Drug smugglers and their accomplices use cellular telephones because the phones help them arrange for the delivery of cargo at predetermined locations and monitor / plan for arrival times;

d. Drug smugglers use cellular telephones to direct couriers to synchronize drop off and pick up times of the illegal cargo;

e. Drug smugglers use cellular telephones to notify or warn accomplices about law-enforcement activity, such as the presence and posture of marked and perceived unmarked patrol vehicles, or the operational status of border checkpoints and border crossings;

f. The use of cellular telephones by smugglers tends to generate evidence stored on the cellular telephones, including but not limited to emails, text messages, application-based communications, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

26. Given the facts surrounding SULLIVAN's arrest, my review of SULLIVAN's border-crossing activity during the months prior to his arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to

7

believe SULLIVAN used the phone associated with the Account, and that information relevant to the smuggling activities of SULLIVAN will be found in a review of the Account. Based on the foregoing and in light of my training and experience, I further submit that there is probable cause to authorize a review of the Account for the time period of April 23 to August 10, 2018.

27. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

28. Based on my training and experience, I know that T-Mobile can collect cell-site data about phones, including information constituting the Account. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

29. Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card

8

account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the phone associated with the Account, and may assist in the identification of co-conspirators.

## CONCLUSION

30. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

31. Based upon my training and experience, consultation with other law enforcement officers experienced in extortion investigations, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that the Account to be seized, as set forth above and in Section I of Attachment B, will be found in the location described in Attachment A, and will contain evidence of violations of 21 U.S.C. §§ 952, 960, 963, 846, and 841. Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent, to order T-Mobile to search its corporate records for the Account and to order T-Mobile to deliver the Account listed in Section I of Attachment B.

Jose Diego, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me this 5th day of November, 2019.

Hon. Allison H. Goddard
United States Magistrate Judge

9